## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN M. MILLAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:11-cv-00438-NT |
| | ) | |
| STATE OF MAINE, | ) | |
| DEPARTMENT OF LABOR, | ) | |
| BUREAU OF REHABILITATION | ) | |
| DIVISION FOR THE BLIND AND | ) | |
| VISUALLY IMPAIRED, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON PLAINTIFF'S APPEAL OF ADMINISTRATIVE DECISION

John Millay, a young man of Ethiopian descent who lives with his adopted family in Surry, Maine, petitioned Maine's Division for the Blind and Visually Impaired (the "**DBVI**") to pay for the expenses incurred by his adopted mother in driving him back and forth from Surry to Bangor, Maine during the course of a culinary arts program Millay completed as a client of the DBVI's federally funded vocational rehabilitation services program. After a state Administrative Hearing Officer ("**AHO**") declined to overturn the DBVI's denial of Millay's request, Millay brought this action under Section 102(c)(5)(J) of Title I of the Rehabilitation Act of 1973—codified at 29 U.S.C. § 722(c)(5)(J)—seeking judicial review of that determination. For the reasons that follow, the AHO's decision is **REVERSED**.

# FACTUAL BACKGROUND

## A.    Millay's Background and Disability

John Millay,[1] a resident of Surry, Maine, is a blind, disabled client of the DBVI.[2] Millay was born in Ethiopia in 1988.[3]  Though the chronology of Millay's early childhood is not entirely clear from the record, it appears Millay's birth mother died when he was three or four years old, and, after a brief stay in his aunt's care, Millay moved into an orphanage.[4] At around the age of five, Millay was kidnapped by an unidentified man who pierced Millay's eyes with a pin, intentionally blinding him.[5] He then forced Millay to beg on the street and, at the end of each day, turn over the money he collected.[6] If Millay's kidnapper was unsatisfied with his daily haul, the man would beat Millay, leaving scars on his back that remain to this day.[7] Millay endured this treatment for two years, until he was rescued by police and taken back to the orphanage.[8]

In June 2000, when Millay was either eleven or twelve years old, he was adopted by Joanne Millay,[9] a resident of Surry, Maine. Millay attended high school in Maine and received a scholarship to attend the University of Maine at Presque Isle ("**UMPI**").[10] Millay enrolled there, living alone in a residential dorm, but he

---

[1]        Documents in the administrative record variously report Millay's first name as "John," "Johannes," and "Yohannes." The Court refers to him as "John Millay" or "Millay," though some record documents quoted below refer to him by his other names.
[2]        Hr'g Tr. 11, 42-43.
[3]        *Id.* at 43; Gaffney Letter 1.
[4]        Hr'g Tr. 43, 59; Gaffney Letter 2.
[5]        Hr'g Tr. 43-44, 65; Gaffney Letter 2.
[6]        Hr'g Tr. 44; Gaffney Letter 2.
[7]        Hr'g Tr. 46; Gaffney Letter 2.
[8]        Hr'g Tr. 45; Gaffney Letter 2.
[9]        For the sake of clarity, the Court refers to Joanne Millay as "Millay's mother."
[10]        Hr'g Tr. 48, 54, 76.

struggled academically and dropped out after one semester.[11] Millay testified that he was unable to sleep in the dorm, because the "dorm was wild" and he did not feel safe in his room.[12] Millay is a slight individual, just under five feet tall and weighing about 100 pounds.[13]

## B.    Millay's Early Involvement with the DBVI

At some point after leaving UMPI, Millay applied to receive vocational rehabilitation services—services to assist the disabled in finding employment—from the DBVI.[14] The DBVI is the Maine agency responsible for providing such services to the blind.[15] The DBVI's vocational rehabilitation services program is primarily funded by the federal government under a grant program established by Title I ("**Title I**") of the Rehabilitation Act of 1973 (the "**Rehabilitation Act**").[16] When Becky Brady began working at the DBVI as a vocational rehabilitation counselor in April of 2009, she was assigned to Millay's case.[17] Brady first met Millay in September of 2009 to discuss Millay's career goal of owning or working at a coffee shop or restaurant.[18] Brady suggested a number of programs Millay could enroll in to acquire the necessary job skills, including Job Corps,[19] a federally funded

---

[11]     *Id.* at 49-50.
[12]     *Id.*
[13]     *Id.* at 78.
[14]     *See id.* at 11.
[15]     *See supra* pp. 20-22 (discussion of statutory and regulatory background).
[16]     *See id.*
[17]     Hr'g Tr. 10.
[18]     *Id.*; Dep't Ex. 1 ("**Brady Case Notes**"), 9/16/09, 1.
[19]     Some documents in the record refer to Job Corps as "JobCorps" (with no space) or "Job Corp" (with no "s").  For the sake of clarity, the references are amended without comment where the Court quotes from these documents.

program with a campus in Bangor, Maine which provides 17-to-24-year-olds with hands-on job training.[20]

Among Job Corps's offerings is a nine-to-twelve month, five-days-a-week program in hospitality and the culinary arts provided to students free of charge under federal grants.[21] Many students who enroll in the program live in dorms on the Job Corps's Bangor campus.[22] For those who live on-campus, federal funds— separate from funds provided under Title I of the Rehabilitation Act of 1973—cover not only the cost of tuition, but also room, board, meals, and a small living stipend.[23] By contrast, commuting students receive only a daily travel stipend that maxes out at $5.70 a day.[24] Though there is no detailed evidence about Job Corps's student body in the record, the general testimony of all four witnesses at Millay's due process hearing suggests that the program attracts a non-traditional population, including many who have struggled in traditional academic environments or gotten into trouble with the law.[25]

Brady's case notes indicate that she and Millay formalized what is referred to in Title I as an "individualized plan for employment," known as an IPE, documenting Millay's career goal and the DBVI's proposed program for Millay to achieve it.[26] In a meeting on October 7, 2009, attended by Brady, Millay and Jeff Jones, a DBVI employment rehabilitation specialist and educational consultant, the

---

[20]    Hr'g Tr. 12; Brady Case Notes, 9/16/09, 1-2.
[21]    Hr'g Tr. 16, 51, 55-56; Pl.'s Ex. 1(a) at 1 (ECF No. 51-1).
[22]    Hr'g Tr. 13-14.
[23]    *Id.* at 16.
[24]    *Id.* at 14, 16.
[25]    *Id.* at 29, 38-39, 53-54, 79, 84.
[26]    Brady Case Notes, 9/16/09, 2.

topic of Job Corps was again broached, and Jones suggest Millay take a tour of Job Corps's facilities in Bangor.[27]

At some point, though it is unclear from the record precisely when, Millay toured Job Corps's Bangor campus and was shown a dorm room.[28] Job Corps's residential students live four-to-a-room, and each receive a locking cabinet in which to store their belongings.[29] Millay was concerned about the prospect of living away from home and in such close proximity to strangers, some of them with troubled pasts.[30]

## C.  Millay's Application to Attend Penobscot Job Corp Academy

On February 1, 2010, Millay applied to be admitted into Job Corps's culinary arts program.[31] Job Corps had concerns about its ability to serve a blind student. Samuel Kunz,[32] Job Corps's admissions counselor, requested information about what assistance the DBVI would be able to provide.[33]  On March 9, 2010, Brady responded to Kunz's concerns by e-mail, informing him that the DBVI could provide Millay with a "Vision Rehabilitation Therapist," an "Orientation & Mobility Specialist," and an "Adaptive Technology Specialist."[34] Brady also offered that the DBVI "would provide financial support[ ] for any significant adaptive equipment that is determined to be necessary for [Millay] to successfully complete his

---

[27]     Hr'g Tr. 31-32; Brady Case Notes, 10/7/09, 1.
[28]     Gaffney Letter 3.
[29]     *Id.*; *see also* Hr'g Tr. 14.
[30]     *See* Brady Case Notes, 4/17/10, 1; Gaffney Letter 3.
[31]     Brady Case Notes, 4/17/10, 1.
[32]     Some documents in the record refer to Kunz as "Coombs" or "Kuntz." For the sake of clarity, these incorrect references are amended without comment where the Court quotes from these documents.
[33]     Brady Case Notes, 7/1/2010, 3.
[34]     *Id.*

studies . . . .”[35] Finally, Brady wrote that Millay was "very eager to hear about his application as soon as possible."[36] Kunz replied the same day.[37] He thanked Brady for submitting the information and indicated that it would "help a great deal as [Job Corps] go[es] through the application process."[38]

By April 17, 2010, neither Millay nor the DBVI had heard back from Job Corps about Millay's application.[39] On April 22, 2010, Brady resolved to "sit down with Sam Kunz at Job Corps to get questions answered about . . . the continuing delay in [the] admissions decision . . . ."[40]

Millay and the DBVI had still not received any word from Job Corps about Millay's application by July.[41] On July 1, 2010, the DBVI's Jones e-mailed Kunz to inquire about the delay.[42] Jones reminded Kunz that the DBVI was "available to continue to provide orientation and mobility [services], vocational rehabilitation [services,] and vision rehab instructor services" to help Millay and Job Corps's staff "meet[ ] the special needs associated with [Millay's] . . . participation in the Job Corp[s] [p]rogram."[43] On July 21, 2010, Jones received a call from Kristin Wiggins, Job Corps's special needs coordinator.[44] According to Brady's case notes, Wiggins

---

[35]     *Id.*
[36]     *Id.* at 7/1/2010, 2.
[37]     *Id.* at 7/1/2010, 1-2.
[38]     *Id.* at 7/1/2010, 1.
[39]     *Id.* at 4/17/2010, 1.
[40]     *Id.* at 4/22/2010, 1.
[41]     *See id.* at 7/1/2010, 1.
[42]     *Id.* at 7/1/2010, 1.
[43]     *Id.*
[44]     *Id.* at 7/21/10, 1.

told Jones she wanted to "get together" with Millay "at Job Corps . . . to begin the admissions process and discuss adaptations needed."[45]

Around May of 2010, one of Millay's sisters,[46] who is sighted, also applied to attend the Job Corps culinary arts program.[47] Unlike Millay, Millay's sister was accepted into the Job Corps program within a week.[48]

On July 22, 2010, Millay and Brady prepared and signed a new IPE, which identified Job Corps as a service that Millay needed to achieve his work goal, known in Title I parlance as an "employment outcome."[49] On the same day, Kunz, Millay, Brady and Millay's mother met to discuss Job Corps's ongoing concerns about what accommodations the school would need to provide in order for Millay to attend its culinary arts program.[50] Kunz told the group that he was continuing "to push for Johannes'[s] admission to go through . . . and . . . would do everything in his power to convince his superiors to get things moving . . . ."[51] During the meeting, Millay informed Brady and Kunz that he was considering commuting to Job Corps and asked whether Job Corps or the DBVI would be able to reimburse him for his travel expenses.[52]

Brady arranged for Millay to meet with Job Corps representatives again on Job Corps's Bangor campus on July 27, 2010.[53] Brady wrote in her case notes that

---

[45]     *Id.*
[46]     The name of Millay's sister is not found in the record. *See* Hr'g Tr. 43, 70.
[47]     *See* Brady Case Notes, 8/3/10, 1; Hr'g Tr. 81.
[48]     Hr'g Tr. 81.
[49]     Dep't Ex. 3 at 5 ("**July 22, 2010 IPE**").
[50]     Brady Case Notes, 8/3/10, 1.
[51]     *Id.* at 8/3/2010, 2.
[52]     *Id.* at 8/3/2010, 1.
[53]     *Id.* at 7/22/2010, 1.

the purpose of the meeting would be to "cover questions, [to go through a] check list of what needs to happen, what's good, what might not be good in terms of environment and accessibility," and to allow Job Corps to "perform[ ] [its] admissions process."[54] The entry indicated that Jones would accompany Millay to the meeting, but that Brady would not be able to attend.[55] Although there is no case note describing the July 27, 2010 meeting in detail, Brady refers to it in a later note and gives the impression that Kunz, Jones, and Millay decided at this meeting that Millay would enroll in Job Corps as a commuter.[56] Millay's mother also testified about a July 2010 meeting with Kunz:

> Kunz . . . said he was an advocate for Yohannes to come but only as a commuter student. . . . [W]e were asking why is admissions taking so long. . . . Kunz said that we have a lot of people who are very nervous about having him on campus and we will not have him in the dorm. There are people who are even nervous about him being here in the day time. And I said well I'm not nervous about him being there in the day time. I mean he's going to be fine. There will be a lot of people around. He said yes but we are not going to accept him as a residential student.[57]

By the last week of August, with the school year nearly underway, Millay's admissions status at Job Corps was still in doubt.[58] On August 25, 2010, Brady wrote in her case notes that she and Jones had been "having conversations with Job

---

[54]    *Id.*

[55]    *Id.*

[56]    The case notes entry describing a September 23, 2010 meeting with Brady, Millay and Millay's mother states:

> [Millay's mother] stated repeatedly that the decision was made that [Millay] would be a commuter student (the decision made by Jeff Jones/DBVI and Sam Kunz/Job Corps and herself—I was not present at the meeting she talked about) and that I could not disregard that decision and force Johannes to live on campus.

*Id.* at 9/23/10, 2; *see also* Hr'g Tr. 23.

[57]    Hr'g Tr. 77.

[58]    Brady Case Notes, 8/25/10, 1.

8

Corps staff regarding their concerns about having [Millay] as a student," and Lynn Creger, Job Corps's human resources coordinator, told Brady that "'some [Job Corps] staff [are] VERY resistant to the idea that a visually impaired person can do ANYTHING.'"[59] Brady agreed to give a presentation at a September 2, 2010 Job Corps staff meeting to allay their concerns, along with a vision rehabilitation therapist and an orientation and movement specialist, but the record does not include any description of this meeting.[60]

## C.     Millay's Admission Into Job Corps

On September 23, 2010, Brady wrote in her case notes that Job Corps had accepted Millay into its culinary arts program and given him a start date of September 27, 2010, but the entry does not indicate when Millay's acceptance occurred and the record contains no written offer of admission.[61]

## D.     The DBVI Rejects Millay's Request for Travel Reimbursements

Beginning in mid-September of 2010, Millay renewed his inquiries into whether the DBVI would reimburse him for his travel costs.[62] The Millay family plan was for Millay and Millay's sister to attend the Job Corps classes together, with Millay's sister ferrying the two of them between Surry and Bangor.[63] Brady scheduled a September 23, 2010 meeting with Millay and Millay's mother to discuss the issue.[64]

---

[59]     *Id.*
[60]     *Id.*
[61]     *Id.* at 9/23/10, 1; *see also id.* at 8/25/10, 1; *id.* at 9/15/10, 1.
[62]     *Id.* at 9/15/10, 1.
[63]     *See id.*; *id.* at 8/3/10, 1; Hr'g Tr. 81.
[64]     *See* Brady Case Notes, 9/15/10, 1; *id.* at 9/23/10, 1.

At that meeting, Brady informed Millay and Millay's mother that the DBVI would not reimburse Millay for any of his travel expenses. Brady described the meeting in her case notes:

> Johannes and I talked about his request for travel funding. I informed him that I could not justify use of funds for him to travel daily when he has the option to stay on campus full time at no cost. I explained that the purpose of DBVI is to assist him in accomplishing his goals by removing or adapting . . . disability related barriers. The Job Corps program has on campus housing and encourages the students to stay on campus in order to get the fullest benefit from their program. . . . I explained that Johannes has the right to choose to stay where ever he wants, but that unless that choice is directly related to accommodating his disability it would not be a cost that DBVI would fund.[65]

Brady testified that she based her decision on Section 9 of the DBVI's Rules Governing Vocational Rehabilitation Services for Individuals Who are Blind or Visually Impaired (the "**2007 DBVI VRS Rules**"),[66] which she understood to require her "to find the most cost-effective way to provide training" and to approve travel reimbursements only if "transportation . . . [is] necessary to enable the applicant or eligible individual to participate in the Voc Rehab services and achieve [an] employment outcome by the most cost-effective means possible."[67] Brady's case notes indicate that the September 23, 2010 meeting ended acrimoniously, with Millay's mother arguing that Brady could not substitute her decision that Millay be a residential student over the

---

[65]     *Id.* at 9/23/10, 1.
[66]     Def.'s Ex. 4. The Code of Maine Rules sections that make up the current DBVI VRS Rules, available on LexisNexis at 12-150-101 Me. Code. R. §§ 1-10 (LexisNexis 2013), incorporate amendments from January 15, 2013, after the AHO's decision in this case was handed down and after Millay completed the Job Corps program. Defendant's Exhibit 4 reproduces the rules as they existed from October 27, 2007 until January 15, 2013. Citations to the rules refer to the copy of the rules in that exhibit, as they are the version of the rules that govern Millay's case.
[67]     Hr'g Tr. 20; 2007 DBVI VRS Rules § 9(13)(B).

decision of Kunz and Jones that Millay be a commuter student. Millay's mother also strongly asserted her opinion that Millay would not be safe in Job Corps's dorms, telling Brady that Job Corps staff had warned her "there are violent students at Job Corps" and it would be dangerous for Millay to even walk the campus's hallways by himself.[68]

Without the DBVI's financial support for his travel costs, Millay and his sister decided to defer enrolling in the Job Corps program.[69]

## E.    Confusion about Millay's Status at Job Corps

Brady and Jones met with Job Corps personnel on October 27, 2010 to discuss Millay's situation.[70] At the meeting, Job Corps administrative services director Barbara Landry told Brady "that it was a surprise to her that Johannes was considering [staying] in the dorms," "that she had never been informed that Johannes would live on campus, that she had understood he would be a commuter student only, and that she felt that Job Corps needed to have certain things in place before an on-campus admissions could be considered."[71] Brady's notes further reflect that, Job Corps "staff expressed concerns regarding liability for possible injury in the dorm setting."[72] Although the DBVI attempted to convince Job Corps personnel to accept Millay as an on-campus student, Landry remained unconvinced and refused to move forward without a "memorandum of understanding" regarding who

---

[68]    Brady Case Notes, 9/23/10, 2-3.
[69]    *Id.* at 11/1/10, 1; Hr'g Tr. 81.
[70]    Brady Case Notes, 11/1/10, 1-3.
[71]    *Id.* at 11/1/10, 1.
[72]    *Id.*

was to provide necessary adaptations for Millay. Brady's notes indicate that Landry stated that:

> [We] cannot let a student in [to Job Corps] not knowing if [we] may subsequently need to spend unreasonable amounts of money so that the student can actually participate in the program . . . [.] [F]unding is limited everywhere and [we] can't afford to take risks.[73]

Sometime around December 3, 2010, Brady called Landry to ask her to send the DBVI an official notice of Millay's admission into Job Corps's culinary arts program.[74] Landry declined, informing Brady that Job Corps's concerns remained and that she could not move forward on Millay's admission without the memorandum of understanding she had requested earlier.[75]

Millay's mother also testified that into October and November of 2010, Job Corps was not willing to admit Millay as a residential student because of concerns about his safety on campus:

> The Job Corp itself expressed many concerns to me . . . and to Yohannes that they did not believe it was safe. . . . Yohannes'[s] admission took more than ten months. It took more than ten months because as recently as October and November [of 2010] Job Corps personnel were telling Yohannes, me and [the DBVI] that they were not satisfied that he could be safe on campus.[76]

## F.  Millay Challenges the DBVI's Denial of Travel Reimbursement Expenses

On November 19, 2010, Millay formally requested a due process hearing to challenge Brady's denial of his request for travel reimbursement expenses.[77] In her

---

[73]  *See id.* at 11/1/10, 2; *id.* at 12/3/2010, 2; Hr'g Tr. 82.
[74]  Brady Case Notes, 12/3/10, 2.
[75]  *Id.*
[76]  Hr'g Tr. 77.
[77]  Hr'g Officer Ex. 1.

case notes following a meeting with her supervisors, Brady wrote her justifications

for the denial. She cited four reasons to support the decision:

> 1.     The Job Corps program provides on campus housing for all students at no charge, with a small stippend [sic] for living expensed [sic] given each week. There is no disability related reason that Johannes could not live on-campus.
> 2.     Attendance is a highly important factor for students attending the Job Corps program. It is set up to reflect a real-world job, if the student misses class or is late for classes this is grounds for dismissal from the program. I am very concerned that if Johannes commutes daily from Blue Hill this will effectively ensure failure due to inevitable transportation/weather related problems.
> 3.     At the time of denial, my understanding was that Johannes'[s] sister was also going to be enrolled in the program and also planned to live at home, so would be commuting to and from Bangor daily whether Johannes was in the car or not. Transporting Johannes would not create an additional cost to her. I felt that it was an unreasonable request to have DBVI pay a third party for an existing ongoing cost.
> 4.     Also, as students each would be receiving a small travel stippend [sic] from Job Corps. This funding combined would likely cover most of the costs of the commute and should be used accordingly. (The exact amount of this stippend [sic] was never disclosed.)[78]

## G.     Dr. Gaffney's Evaluation of Millay

On January 4 and 14, 2011, Millay met with licensed clinical psychologist

Thomas J. Gaffney, who performed a detailed clinical assessment of Millay's mental

health.[79] On January 24, 2011, Dr. Gaffney sent a letter to the DBVI documenting

Millay's background and resulting psychological struggles.[80] The letter begins by

detailing some of Millay's recurring problems: that he is a "light sleeper," that

"[e]ven a little noise can startle him, frighten him[,] and make it difficult to return

---

[78]     Brady Case Notes, 12/3/10, 1.
[79]     *Id.*
[80]     *Id.*

to sleep," that he "is not comfortable staying in a room with people he does not know," and that he "worries a great deal about people stealing his belongings."[81] Dr. Gaffney later concludes that Millay's fears "seem[ ] to have their root in the traumatic experiences . . . he endured from the time he was three until he was five years of age."[82] Ultimately, Dr. Gaffney concludes that Millay "presents what appear[ ] to be very clear symptoms of Post Traumatic Stress Disorder" ("**PTSD**"), but recommends a follow-up clinical assessment.[83] Regarding Job Corps, Gaffney explains that Millay "seems to be trying to avoid going into dorm life . . . as an attempt to limit the arousal of recollections of his trauma" and concludes that "[t]o ask him, at this time, to live in the dorm . . . is simply too much to ask of him emotionally."[84]

## H. Millay Begins Classes at Job Corps

Millay finally began classes at Job Corps as a commuter student in February of 2011.[85] It is not clear from the record what changed to allow Millay to begin his coursework.

By this point, Millay's sister had begun a different job-training program and started working part-time, so she was no longer available to drive Millay back and forth to Bangor.[86] Instead, Millay's mother assumed the chauffeuring

---

[81] *Id.*
[82] Gaffney Letter 2-3.
[83] *Id.* at 3-4.
[84] *Id.* at 4.
[85] *Compare* Hr'g Tr. 24 (Brady's testimony that Millay was in the fifth week of the program on April 4, 2011) *with* Hr'g Tr. 55 (Millay's testimony that he was in the seventh week of the program on April 4, 2011).
[86] Hr'g Tr. 81.

responsibilities.[87] Because of her responsibilities to a severely disabled daughter, Millay's mother often made two round trips per day.[88] Millay was required to cover the entire cost of his commute pending the outcome of his appeal to the AHO.[89]

During Millay's first four weeks of class, he was tardy four times, though never by more than a couple minutes.[90] He also received positive critiques from his Job Corps instructors, who noted that he "displayed an excellent attitude," was "on time, in uniform, and ready for class," and was "engaged and professional."[91]

## I.    Millay's Due Process Hearing

On February 28, 2011, over a month before his due process hearing, Millay sent a letter to the Office of Administrative Hearings of Maine's Department of Health and Human Services requesting that subpoenas be issued to twelve individuals, including Sam Kunz and Kristin Wiggins from Job Corps and Dr. Gaffney.[92] On March 3, 2011, Assistant Attorney General ("**AAG**") Elizabeth Wyman, who represented the DBVI, objected to the issuance of subpoenas to two of Millay's proposed witnesses, but offered no objection to subpoenaing Kunz or Wiggins. The same day, chief administrative hearing officer James D. Bivins wrote to inform Millay that he could not approve the subpoena requests unless Millay provided information about what each witness's testimony would be and why their

---

[87]    *Id.* at 51-52; 80-81.
[88]    *Id.* at 80-81.
[89]    Pre-Hr'g Conference Tr. 16, 35. The transcript of Millay's January 31, 2011 pre-hearing conference appears in the administrative record directly after the transcript of the due process hearing.
[90]    Hr'g Tr. 24.
[91]    *Id.* at 25; Claimant's Ex. 4 at 1-2.
[92]    Hr'g Officer Ex. 8.

testimony would be relevant.[93] Chief AHO Bivins also informed Millay that he would forward a copy of Millay's subpoena request to the AHO hearing his case and to the DBVI.[94] The record contains no response from Millay, and it appears no subpoenas were ever issued. On March 31, 2011, an intern from the Disability Rights Center sent an e-mail to the Office of Administrative Hearings indicating that Dr. Gaffney would not be available to testify on April 4, 2011 and requesting that Millay's case be held open after the close of the hearing to allow Dr. Gaffney to testify by telephone later in the week.[95] A DBVI employee responded that the AHO had decided to rule on the matter at the April 4, 2011 hearing.[96]

AHO Hugh Hooper conducted Millay's due process hearing on April 4, 2011.[97] An intern from the Disability Rights Center presented on Millay's behalf, under the supervision of attorney Peter Rice, while AAG Wyman presented for the DBVI.[98] Each side offered testimony from two witnesses: the DBVI called Brady and Jones, while Millay testified and also called his mother.[99] Several pieces of evidence were entered into the administrative record as well, including correspondence demonstrating the procedural history of Millay's case, Brady's extensive contemporaneous case notes documenting her interactions with Millay, Millay's

---

[93]     Hr'g Officer Ex. 9.
[94]     *Id.*
[95]     Claimant Ex. 1 at 2.
[96]     *Id.* at 1.
[97]     Hr'g Officer Ex. 11; Hr'g Tr. 1.
[98]     Hr'g Tr. 1.
[99]     *Id.* at 10, 31, 41, 70.

July 22, 2010 IPE, Millay's recent Job Corps evaluations, and DBVI regulations and procedural directives.[100]

Much of the substance of the witnesses' testimony and the evidence entered into the record is summarized and considered above. Additional evidence concerning Millay's PTSD was also admitted.[101] At the end of the hearing, Millay was allowed to enter into evidence the five-page letter Dr. Gaffney wrote to the DBVI on January 24, 2011, documenting Millay's ongoing struggles with PTSD and recommending against requiring Millay to live on Job Corps's campus.[102]

## J.     The AHO's Decision

On May 6, 2011, the AHO issued a written decision, finding for the DBVI. The decision is based entirely on the AHO's application of the 2007 DBVI VRS Rules and cites no other sources of law.  It first finds that there is "no doubt" that "the most cost-effective means" for Millay to take classes at Job Corps is for him to live on Job Corps's Bangor campus.[103] Next, the opinion credits Millay's stated reasons for preferring to attend Job Corps as a commuter, but finds that commuting was "his choice" and that travel reimbursements were not "necessary" for Millay to achieve his employment goal.[104] The decision also credits the DBVI's "non-financial" reason for declining Millay's request for travel reimbursements: that living on campus would allow Millay a valuable opportunity to gain independent living

---

[100]     *Id.* at 7-9, 65-69, *see also* Hr'g Officer Exs. 1-11 (documenting procedural history of case); Dep't Ex. 3 (same); Claimant Exs. 1-2, 6 (same); Dep't Ex. 1 (Brady's case notes); Dep't Ex. 2 (Millay's July 22, 2010 IPE); Claimant Ex. 4 (Millay's Job Corps student evaluations); Dep't Ex. 4 (DBVI regulations); Claimant Ex. 3 (DBVI procedural directive).
[101]     Hr'g Tr. 47, 74.
[102]     *Id.* at 87-89; Gaffney Letter 1.
[103]     Admin. Hr'g Decision 4.
[104]     *Id.* at 4-5.

skills.[105] Finally, the decision effectively dismisses Dr. Gaffney's letter, noting that it seemed to be written from "an advocate's perspective rather than from an objective professional's perspective" and this "tend[ed] to limit the weight" it was due.[106] In the decision's conclusion, the AHO summarizes his reasoning as follows:

> [A] [d]ecision in this matter must be based solely on the governing rules. Those rules are clear in that in order for the [DBVI] to pay transportation costs for Mr. Millay it must be necessary for him to incur travel expenses to complete his Job Corp[s] training. That simply is not the case here. While he has the right to commute, and his reasons for choosing to commute are understood, Mr. Millay can complete his Job Corps training by living on campus at no additional cost to the Division.[107]

## K.    Millay's Graduation from Job Corps

Notwithstanding the AHO's decision, Millay continued to attend the Job Corps culinary arts program.[108] Millay graduated from the program in April of 2012.[109]

## PROCEDURAL HISTORY

On November 15, 2011, Millay filed a complaint (ECF No. 1) against the DBVI in this Court, claiming unlawful discrimination under the Maine Human Rights Act, the Americans with Disabilities Act, and Title V of the Rehabilitation Act. The DBVI responded by filing a motion to dismiss (ECF No. 7). On May 5, 2012, the Magistrate Judge issued a recommended decision (ECF No. 12)

---

[105]    *Id.* at 5.
[106]    *Id.*
[107]    *Id.* at 5.
[108]    Pl.'s Br. Ex. 1(a) (ECF No. 51-1).
[109]    *Id.* An order issued by the Magistrate Judge (Kravchuk, J.) on April 2, 2013 granted Millay permission to supplement the administrative record in this case with the Job Corps Certificates, which document his graduation. Order Re: Pl.'s Mot. to Supplement the R. (ECF No. 50).

concluding that the Court should dismiss all the Plaintiff's discrimination claims, but that Millay was likely entitled to bring an appeal of the AHO's decision under Title I of the Rehabilitation Act. Neither party objected to the Magistrate Judge's recommended decision. Report of Telephone Conference and Order 1 (ECF No. 24).

Millay then moved for leave to amend his complaint (ECF No. 26) in order to withdraw his earlier claims and instead bring an appeal of the AHO's decision. The DBVI opposed the motion (ECF No. 29), maintaining that Millay's appeal was time-barred and that the relief Millay was requesting was unavailable under the Eleventh Amendment. The Magistrate Judge issued a recommended decision on September 21, 2012 (ECF No. 31), concluding that Millay's claims were not time-barred and that he was entitled to seek injunctive relief and equitable reimbursement notwithstanding the Eleventh Amendment. On December 5, 2012, this Court adopted the Magistrate Judge's recommendation (ECF No. 35). The following day, Millay filed his second amended complaint (ECF No. 36), the complaint currently before the Court. Millay seeks to have the Court reverse the AHO's affirmation of the DBVI's denial of his request for travel reimbursements and to award him injunctive relief, equitable reimbursement, prejudgment interest and costs, and any other appropriate relief available under Title I of the Rehabilitation Act.

## STATUTORY AND REGULATORY BACKGROUND

Title I grants states federal funding to allow them to provide disabled individuals with "vocational rehabilitation services." *See* 29 U.S.C. §§ 720(a)-(b),

723(a). To be eligible to receive grants, a state must submit a plan to the commissioner of the federal government's Rehabilitation Services Administration outlining how it will develop "individualized plan[s] for employment," or IPEs, for disabled individuals living in its borders. 29 U.S.C. § 721(a)(9)(A). This plan must also provide assurances that the state will provide the services called for by its clients' IPEs. 29 U.S.C. § 721(a)(9)(B). If the Rehabilitation Services Administration commissioner approves a state's plan, federal funding is available for about four-fifths of the cost of providing vocational rehabilitation services. 29 U.S.C. §§ 705(14), 721(a)(3), 730. State and local agencies pick up the rest of the tab, though the total amount of federal funding a state can receive each year is capped. 29 U.S.C. §§ 705(14), 721(a)(3), 730.

Under Title I, an individual is eligible to receive vocational rehabilitation services if he or she qualifies as an "individual with a disability" and "requires vocational rehabilitation services to prepare for, secure, retain, or regain employment." 29 U.S.C. § 722(a)(1). A state that participates in Title I's grant program does not need to accept all eligible individuals, but can instead establish criteria to accept only those with the most serious needs. 29 U.S.C. § 721(a)(5). However, once a state agrees to provide a specific individual vocational rehabilitation services using Title I funds, its discretion narrows: it must then provide that individual with the full spectrum of services delineated in Title I. *Schornstein v. N.J. Div. of Vocational Rehab. Servs.*, 519 F. Supp. 773, 780 (D.N.J. 1981).

Title I prescribes a number of specific procedures for the development of an IPE. For instance, Title I requires the responsible state agency to "develop[ ]" and "implement[ ]" an IPE "in a manner that affords eligible individuals with the opportunity to exercise informed choice" in choosing: (1) "an employment outcome"; (2) "the specific vocational rehabilitation services to be provided under the plan"; (3) "the entity that will provide the vocational rehabilitation services"; and (4) "the methods used to procure the services." 29 U.S.C. § 722(b)(2)(B). Title I mandates that the IPE be reduced to a "written document" that is "agreed to, and signed by" the eligible disabled individual or a representative and "approved and signed by a qualified vocational rehabilitation counselor employed" by the responsible state agency. 29 U.S.C. § 722(b)(2)(A), (C). And Title I requires that this document include, among other things, "a description of the specific employment outcome that is chosen by the eligible individual," "a description of the specific vocational rehabilitation services that are . . . needed to achieve the employment outcome," and "the terms and conditions of the [IPE], including, as appropriate," the responsibilities of the state agency for facilitating the services. 29 U.S.C. § 722(b)(3)(A), (B), (E).

Title I also requires participating states to allow individuals to challenge determinations by state agents regarding the provision of vocational rehabilitation services in a "due process hearing" conducted by an "impartial hearing officer." 29 U.S.C. § 722(c)(5). Title I provides that the officer presiding over this hearing must reach his decision by looking to the State's rehabilitation plan, the substantive

provisions of Title I, and applicable state regulations. *Id.* An individual dissatisfied with the hearing officer's decision—or an agency's subsequent administrative review of the decision, if there is one—may challenge it by bringing a civil action in either state or federal court. 29 U.S.C. § 722(c)(5)(J).

The State of Maine participates in the grant program established by Title I. The DBVI—a division of the Bureau of Rehabilitation, which is part of the Maine Department of Labor—is the state agency responsible for providing vocational rehabilitation services to blind individuals in Maine and promulgating rules to ensure they are provided fairly. 2007 DBVI VRS Rules § 1. The Rules supplement the relevant procedural provisions in Title I.

## STANDARD OF REVIEW

Section 722(c)(5)(J) provides for federal district court review of the results of due process hearings conducted by state AHOs under Title I of the Rehabilitation Act. 29 U.S.C. § 722(c)(5)(J). In conducting such a review, the Court "shall grant such relief as [it] determines to be appropriate" based on the "preponderance of the evidence." 29 U.S.C. 722(c)(5)(J)(ii)(III).

The First Circuit has never discussed how district courts should apply § 722(c)(5)(J)'s standard of review. However, other courts considering the issue have looked to cases interpreting an analogous provision in the Individuals with Disabilities Education Act (the "**IDEA**"),[110] "given that the text and structure of [the

---

[110]    Under the IDEA, states which receive certain federal funds must provide all age-eligible children a "free appropriate public education." *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008).

judicial review provisions of the IDEA and Title I] are virtually identical." *Reaves v. Mo. Dep't of Elementary and Secondary Educ.*, 422 F.3d 675, 681 (8th Cir. 2005) (applying the IDEA's standard of review in a Rehabilitation Act case); *Wasser v. N.Y. State Office of Vocational and Educ. Servs. for Individuals with Disabilities*, 602 F.3d 476 (2nd Cir. 2010) (same). As the reasoning these courts employ is persuasive and neither party disputes the issue, the Court will apply the modified *de novo* standard of review developed under the IDEA to the Plaintiff's appeal of the AHO's decision.

The First Circuit described the IDEA standard of review in *Sebastian M. v. King Philip Regional School District*, 685 F.3d 79 (1st Cir. 2012):

> A district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the requirement that the court give due weight to the hearing officer's findings. As a result, a district court's review falls somewhere between the highly deferential clear-error standard and the non-deferential *de novo* standard. We have characterized this intermediate level of review as one of involved oversight.

*Sebastian M.*, 685 F.3d at 84 (internal block quoting removed) (quoting *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35-36 (1st Cir. 2012)).

Essentially, the district court reviews the administrative record as if it were "'conduct[ing] a bench trial based on a stipulated record,'" except that it also gives "due deference to the findings of the administrative hearing officer," particularly to findings that are reasoned persuasively or fall within the unique policy expertise of the agency. *Sebastian M.*, 685 F.3d at 85 (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993); *see also Bd. of Educ. of the Hendrick*

23

*Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207-208 (1982) ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States. . . . [O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."); *Sch. Union No. 37 v. Ms. C.*, 518 F.3d 31, 35 (1st Cir. 2008) (the reviewing district court must "exercise[ ] its discretion, informed by the record and by the expertise of the administrative agency and the [local] officials, as to how much deference to afford the administrative proceedings"); *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir. 1993) ("[T]he persuasiveness of a particular administrative finding, or the lack thereof" determines whether the district court should show it deference). Additionally, the party challenging a hearing officer's decision carries the burden of proof throughout its review by the Court. *D.B.,* 675 F.3d at 35 & n.3.

A district court should defer to a hearing officer's determination such as the weight to be given expert testimony that involves analyzing fine-tuned matters within the AHO's area of expertise, *see Sebastian M.*, 685 F.3d at 86, but where the AHO fails to address important evidence in the record, deference may not be appropriate. *See Ms. C.*, 518 F.3d at 33-34.

## DISCUSSION

### A.    "Necessary" Services

#### 1.    The Legal Standard

The main substantive standard governing the sufficiency of the vocational rehabilitation services a state agency provides an individual under Title I comes

from the statutory definition of "vocational rehabilitation services" itself. The Rehabilitation Act defines "vocational rehabilitation services" as follows:

> [A]ny services described in an [IPE] *necessary to assist an individual with a disability* in preparing for, securing, retaining, or regaining an employment outcome that is consistent with the strengths, priorities, resources, concerns, abilities, capabilities, interests, and informed choice of the individual . . . .

29 U.S.C. § 723(a) (emphasis added). Though Title I does not define the term "necessary," the core legal issue in a case like this is whether the particular service the state agency refused to provide was "necessary" to achieve the employment outcome identified in the individual's IPE. *See Yochim v. Gargano*, 882 F. Supp. 2d 1068, 1080 (S.D. Ind. 2012) ("[N]*ecessity*—not superiority—of services is the touchstone of Title I . . . ."); *Carrigan v. N.Y. State Educ. Dep't*, 485 F. Supp. 2d 131, 138-42 (N.D.N.Y. 2007) (analyzing Title I case under "necessity" standard).

Eighteen subsections appended to the statutory definition of "vocational rehabilitation services" provide specific examples of programming that may qualify as "necessary." 29 U.S.C. § 723(a)(1)-(18). Among these subsections is § 723(a)(8), which lists "transportation . . . that is provided in connection with the provision of any other service described in this section and needed by the individual to achieve an employment outcome," and § 723(a)(17), which lists "services to the family of an individual with a disability necessary to assist the individual to achieve an employment outcome." 29 U.S.C. § 723(a)(8), (17).

Guidance is also found in federal regulations promulgated under the authority of Title I. These regulations provide that a state agency providing vocational rehabilitation services "must ensure" that "travel and related expenses

that are necessary to enable an applicant or eligible individual to participate in a vocational rehabilitation service" are "available to assist [a disabled client] in preparing for . . . an employment outcome . . . ." 34 C.F.R. §§ 361.48, 361.48(h), 361.5(b)(57). The regulations include illustrations of transportation expenses that would qualify:

> Example 1: Travel and related expenses for a personal care attendant or aide if the services of that person are necessary to enable the applicant or eligible individual to travel to participate in any vocational rehabilitation service.

> Example 2: The purchase and repair of vehicles, including vans, but not the modification of these vehicles . . . .

34 C.F.R. § 361.5(b)(57)(i). The regulations caution, however, that these examples "are not intended to substitute for individual counselor judgment." *Id.*

The 2007 DBVI VRS Rules provide further governing standards. Section 9 of the Rules mandates that the DBVI "provide . . . any goods or services determined necessary for the individual to achieve an employment outcome." 2007 DBVI VRS Rules § 9. But Section 9 also places expense-based limits on how the DBVI should furnish aid, requiring that "[s]ervices that are of sufficient quality . . . be provided as cost effectively as possible to meet the individual's needs." *Id.* Like Title I and the federal regulations, Section 9 discusses transportation specifically:

> Supportive [s]ervices [m]ay [i]nclude . . . . [t]ransportation, including travel and related expenses that are necessary to enable an applicant or eligible individual to participate in a vocational rehabilitation service and achieve an employment outcome by the most cost-effective means possible.

2007 DBVI VRS Rules § 9(13)(B).

Title I does not discuss what role expense should play in how state agencies provide vocational rehabilitation services. In *Buchanan v. Ives*, 793 F. Supp. 361 (D. Me. 1991), this District provided some clarification. First, a state agency may not "apply[ ] a cost efficiency analysis to the determination of a client's goals and needs." *Buchanan*, 793 F. Supp. at 364. However, "once a client's goals and needs have been identified," the state may "consider cost in providing services to [the client] in an efficient manner . . . ." *Id.*; *see also Yochim*, 882 F. Supp. 2d at 1079-80 (state agency did not violate Title I when it refused to send a client to out-of-state center for the blind where local institutions could provide sufficient training at lower cost); *Hoitt v. Dep't of Rehab.*, 207 Cal. App. 4th 513 (Cal. Ct. App. 2012) (state agency did not violate Title I when it declined to reimburse client the full cost of attending a private school where less expensive program was available).

## 2. The Parties' Positions

The Plaintiff contends that the AHO's analysis of the question of necessity includes three errors, each of which requires the Court to reverse its decision. First, the Plaintiff contends that "there is no evidence . . . that the Penobscot Job Corps was prepared to accept John Millay as a resident student," so "it was absolutely necessary for Mr. Millay to reside at home and to commute to his classes." Pl.'s Br. 12. Second, the Plaintiff argues that even if Job Corps was prepared to accept Millay as a residential student, commuting was still necessary, given Millay's difficulty living in the dorms at UMPI and his ongoing struggle with PTSD. Pl.'s Br. 12. In a similar vein, the Plaintiff suggests the DBVI's decision is at odds with language in § 723(a) which specifies that vocational rehabilitation services must be

provided in a manner "consistent with the informed choice of the individual." 29 U.S.C § 723(a); Pl.'s Br. 10 -11. Third, the Plaintiff argues that the AHO engaged in an erroneous analysis of cost-effectiveness by assuming that the on-site living arrangements available at Job Corps were "free." Pl.'s Br. 13. The Plaintiff contends that the appropriate cost-effectiveness analysis would take into account the full expenditure of government resources required to provide a particular vocational rehabilitation service, whether incurred by the state or the federal government. Pl.'s Br. 13.

The Defendant disagrees with the Plaintiff's assertion that Job Corps was not prepared to have Millay live on campus. Def.'s Br. 13. The Defendant also argues that the AHO correctly discounted concerns about Millay's PTSD, given Dr. Gaffney's own admission that further evaluation of Millay's mental condition was still necessary and the bias demonstrated by his letter. Def.'s Br. 12-13. The Defendant answers the Plaintiff's "informed choice" argument by noting that this District has made clear that a state agency's "rehabilitation counselor must make the final decision on eligibility and the scope of services provided" under Title I. *Buchanan*, 793 F. Supp. at 366; Def.'s Br. 14; *see also Yochim*, 882 F. Supp. 2d at 1079. Finally, the Defendant contends that the AHO correctly based his cost-effectiveness analysis on the expense that the DBVI would incur in providing Millay with vocational rehabilitation services and correctly disregarded expenses borne only by the federal government. Def.'s Br. 15.

### 3. Applying the Standard

The Defendant does not dispute that Millay is disabled, that Millay's July 22, 2010 IPE is valid, or that the IPE called for Millay to receive training in culinary arts at Job Corps. Instead, the parties dispute whether it was Millay's choice to attend Job Corps as a commuter, as the Defendant asserts, or whether Job Corps only accepted Millay into its program on the condition that he commute, as the Plaintiff asserts.

Although Brady testified that Job Corps has "on campus housing available for all students," and she seemed to believe that Job Corps had agreed to accept Millay as an on-campus student, the preponderance of the evidence, including her case notes, indicates otherwise. *See, e.g.,* Hr'g Tr. 17, 19.

Job Corps's admissions counselor Sam Kunz made it clear to Brady from as early as March of 2010 through September of 2010 that although he supported Millay's application, he had to convince his superiors that Job Corps should accept Millay. Kunz appears to have been in agreement with the decision made by DBVI education specialist Jones and Millay at their July 27, 2010 meeting that Millay should begin Job Corps as a commuter student. Even Jones testified that the decision reached was to start Millay as a commuter student and see if he could work into becoming a residential student. Millay's mother testified unequivocally that Job Corps had accepted Millay strictly as a commuter student based on its concerns that it could not guarantee Millay's safety. Millay's mother's testimony on this point is corroborated by Brady's case notes.

Brady's notes describe the struggle within Job Corps and between Job Corps and the DBVI over whether Job Corps could accommodate a blind student. A clear picture emerges from a careful reading of the case notes: Job Corps had not accepted Millay as an on-campus student as of his September 27, 2010 start date.

Furthermore, Job Corps administrative services director Landry indicated in October and December of 2010 that Job Corps would not even consider enrolling Millay as a residential student until the DBVI and Job Corps had entered a memorandum of understanding about costs associated with accommodating Millay. When Brady asked for a letter of acceptance for Millay in December of 2010, Landry refused to provide it. Although neither side called any of Job Corps's employees to testify, it was clearly Millay's intention to do so. The omission is not fatal to Millay, in large part due to the detailed record created by Brady in her case notes.

The AHO found that "it is not necessary for . . . Millay to commute" and that "it is [Millay's] choice to live at home," but failed to support these conclusions with citations to the record or persuasive reasoning. Admin. Hr'g Decision 4. More troublingly, the AHO's decision makes no mention of Brady's case notes except to report the bare fact that they were admitted into evidence. Brady's case notes— contemporaneous observations of the events in question,[111] many of them recorded before this litigation began and the battle lines between the parties were drawn— are crucial. The Court would typically adopt an AHO's determinations about the credibility of live witnesses, especially where those determinations are based on

---

[111] Brady testified that she creates her case notes by sitting down shortly after each meeting she conducts with a client and writing a summary of the issues that were discussed. Hr'g Tr. 18.

observations of demeanor. *See Goldstein v. Middendorf*, 535 F.2d 1339, 1342 (1st Cir. 1976). But here, where the AHO failed to analyze the testimony in light of critical, reliable evidence discrediting one side's version of the events, his conclusions are entitled to less deference. *See Cordero-Trejo v. Immigration and Naturalization Serv.*, 40 F.3d 482, 487 (1st Cir. 1994); *Ms. C.* 518 F.3d at 33-34 (upholding district court's reversal of administrative IDEA decision where AHO failed to properly address key evidence in the record); *cf. Sebastian M.*, 685 F.3d at 81, 85-86 (upholding district courts affirmation of administrative IDEA decision where district court properly deferred to AHO's determination about which side's expert testimony to credit given that it required AHO to draw on agency policy expertise).

Giving both Brady's case notes and the administrative hearing decision their proper weight, the "preponderance of the evidence" supports a different conclusion than that reached by the AHO: that, as of the fall of 2010 and early 2011, when the DBVI rejected Millay's request for travel expense reimbursement and the AHO upheld its decision, Job Corps was prepared for Millay to attend its culinary arts program as a commuter but not as a residential student.

It is possible, of course, that Millay's resistance to living on campus was communicated to Job Corps staff and influenced Job Corps's decision not to admit Millay as a residential student. On the other hand, it is also possible that Millay's resistance, in the first instance, was a result of information communicated to him by Job Corps staff—that they were not sure that they could safely accommodate his

disability and that it might not be wise for someone so vulnerable to live among Job Corps's harder-edged students. Either way, the crucial fact remains the same: at the time the DBVI rejected Millay's request for travel reimbursement, the preponderance of the evidence in the record indicates that Millay did not have the "choice" to live on campus even if he wanted to, as Job Corps had by then made an independent decision to admit him only as a commuter.

With that factual predicate settled, this becomes an easy case. Millay's IPE called for him to attend Job Corps's culinary arts program. The only way Millay could take advantage of the services called for by his IPE was to travel each day from Surry to Bangor and back. Thus, this case can be distinguished from Title I cases where clients sought to have the state provide money for expensive services though cheaper options that satisfied their IPEs were readily available. *Cf. Yochim*, 882 F. Supp. at 1079-80; *Hoitt*, 207 Cal. App. 4th at 516-21, 525.

Under Title I and the federal and state regulations promulgated under its authority, commuting was "necessary" for Millay to participate in the Job Corps program called for in his IPE, and the DBVI was obligated to reimburse Millay for his commuting expenses or provide him a more cost-effective way to get to and from school. *See, e.g.,* 29 U.S.C. § 723(a); 34 C.F.R. §§ 361.48, 361.48(h), 361.5(b)(57); 2007 DBVI VRS Rules § 9; *Schornstein*, 519 F. Supp. at 780. Accordingly, the DBVI's denial of Millay's request for travel reimbursements was improper, and Millay is entitled to relief from the AHO's decision affirming that improper denial.

Because the Court decides this case on the basis of the Plaintiff's first argument, it need not address the more difficult questions of whether Millay's PTSD made it necessary for him to live at home rather than on Job Corps's campus, whether the DBVI ran afoul of Title I's "informed choice" provisions, whether the AHO committed reversible error by only considering the 2007 DBVI VRS Rules and not the text of Rehabilitation Act and applicable federal regulations, and how to properly analyze cost-effectiveness under Title I and the 2007 DBVI VRS Rules.

## B.    Relief

Section 722(c)(5)(J) provides that a district court hearing an appeal of a state agency's final decision regarding the provision of vocational rehabilitation services "shall grant such relief as the court determines to be appropriate." 29 U.S.C. § 722(c)(5)(J)(ii)(III).  The Plaintiff's second amended complaint requests that the Court order the Defendant to pay equitable reimbursement for the Plaintiff's travel expenses, award prejudgment interest and costs, enjoin the DBVI and its employees from violating the Plaintiff's rights under the Rehabilitation Act in the future, and grant "such other and further relief as may be just and proper." Second Am. Compl. 5.

The Plaintiff is entitled to equitable reimbursement equivalent to the amount he would have received from the DBVI had it not rejected his request that it pay his travel expenses. *Millay v. Me. Dep't of Labor*, No. 1:11-CV-00438-NT, 2012 WL 6045775 (D. Me. Dec. 5, 2012) (Mag. J. Kravchuk's recommended decision, also available at ECF No. 31), *adopted by Millay v. Me. Dep't of Labor*, No. 1:11-CV-00438-NT, 2012 WL 6043964 (D. Me. Dec. 5, 2012) (also available at ECF No. 35)

(Eleventh Amendment does not bar granting equitable reimbursement under Title I's relief provision); *see also Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370-71 (1985) (holding that identically worded relief provision in the IDEA empowered district court to grant equitable reimbursement to plaintiff for "expenses that [the state] should have paid all along and would have borne in the first instance had it developed a proper IEP").

The evidence in the record about Millay's travel expenses is both conflicting and incomplete. Brady testified that Job Corps provides commuter students with a daily travel stipend of up to $5.70 per day, but it is unclear whether Millay ever received that stipend.[112] Brady also gave a rough estimate of the daily cost of the gas required for Millay's commute, testifying that "if their vehicle gets twenty miles per gallon and gas costs $4.00 bucks a gallon it would be $13.60."[113] However, the exact basis for her calculations is not clear, particularly since she testified on direct that Millay's Surry home is 84 miles from Job Corps's campus, but on cross that his daily roundtrip would be just 68 miles.[114] Millay's mother testified that her car "probably gets 20 miles per gallon" and that she spent "about 4-and-a-half hours a day" driving Millay, because she needed to return home in the middle of each day to take care of Millay's disabled sister.[115] Millay's mother also testified that her costs ran to about "$100, $120 a week . . . without wear and tear on the car, which is

---

[112]    *Compare* Hr'g Tr. 16 (Brady's testimony) *with* Hr'g Tr. 93 (Millay's mother's testimony).
[113]    Hr'g Tr. 16-17.
[114]    *Id.* at 15, 27.
[115]    *Id.* at 80.

pretty considerable."[116] And on cross, when the state's attorney asked Millay's mother precisely how much money Millay was seeking from the DBVI, she estimated her expenses were $30 a day, without including the value of her time.[117] Finally, Millay entered into evidence a DBVI procedural directive which, provides guidance regarding transportation expenses.[118] The directive suggests that the DBVI should reimburse clients for some car repairs, but does not make clear which ones or what criteria to use to make the decision.[119] And the directive provides no guidance about how the DBVI should reimburse clients for wear and tear incurred in traveling to and from the site where a vocational rehabilitation service is provided.

Earlier in these proceedings, the Plaintiff requested the opportunity to supplement the administrative record with a declaration from Millay's mother detailing Millay's travel expenses. Pl.'s Mot. to Supp. the R. with Inc. Mem. 1-2 (ECF No. 46). The Defendant objected to the request, Def.'s Objection to Pl.'s Mot. to Supp. the R. (ECF No. 47), and the Magistrate Judge denied the Plaintiff's motion, but only provisionally, noting that additional evidence "might prove appropriate at a later date . . . if Millay prevails in this litigation." Order Re: Pl.'s Mot. to Supp. the R. 2 (ECF No. 50). As the Magistrate Judge explained, "it is unnecessary to cross that bridge unless and until the court determines that the administrative hearing

---

116     *Id.* at 81.
117     *Id.* at 91-92.
118     Claimant Ex. 3 at 1.
119     *Id.* at 2, 4.

officer erred in failing to award transportation expenses . . . ." *Id.* Given the Court's decision here, that time has now come.

As discussed above, Section 722(c)(5)(J) provides that a district court reviewing a hearing officer's determination on the administrative record "shall hear additional evidence at the request of a party." 29 U.S.C. § 722(c)(5)(J)(ii)(II). Though the First Circuit has not construed this provision in Title I, it has interpreted nearly identical language in the IDEA several times, first in *Town of Burlington v. Department of Education for the Commonwealth of Massachusetts*, 736 F.2d 773 (1st Cir. 1984). There, the First Circuit held that the use of the word "additional" in the IDEA should be construed narrowly, to mean "supplemental." *Burlington*, 736 F.2d at 790. The court explained that decisions about whether to allow parties to supplement the record "must be left to the discretion of the trial court," but also established criteria to constrain the exercise of that discretion. *Id.* at 791. On the one hand, the court explained, the IDEA's "additional evidence" provision "does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony . . . ." *Id.* at 790. The court elaborated:

> In ruling on motions for witnesses to testify, a court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources.

*Id.* at 791. Thus, *Burlington* established a rebuttable presumption that a witness who testified at an IDEA administrative hearing may not offer further testimony before the district court reviewing the AHO's decision. *Id.* On the other hand, the

court also offered a non-exhaustive list of situations where district courts should allow a party to enter "additional evidence":

> The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.

*Id.* at 790*; see also Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 996-97 (1st Cir. 1990) (supplementing the record not allowed where a disabled student's parents held back retained experts' testimony during administrative hearing for tactical reasons and on appeal to federal district court moved to supplement the record with experts' testimony).

Here, the Plaintiff's failure to introduce more evidence about his expenses at the due process hearing is neither pernicious nor surprising. At the time the hearing was held, Millay had only been taking classes at Job Corps for a number of weeks. He could not present evidence regarding his April 2011 to April 2012 expenses, because that evidence—which concerns expenses incurred *after* the due process hearing—did not yet exist. There is no suggestion that Millay withheld evidence from the AHO in any strategic way, nor does the additional evidence Millay offers deal with rehabilitational policy.

Because the Plaintiff has provided a "solid justification" for the additional evidence he offers, *Roland M.*, 910 F.2d at 996, he defeats *Burlington*'s rebuttable presumption. *See Burlington*, 736 F.2d at 791. Accordingly, the Court now grants the Plaintiff's earlier motion to supplement the record as to travel expenses the DBVI should have reimbursed. *See Pihl v. Mass. Dep't of Educ.*, 9 F.3d 184, 191 (1st

Cir. 1993) (under the IDEA, district court may take additional evidence rather than remand to an AHO where "further delay in . . . already protracted litigation would serve no purpose").

Neither party has briefed whether the Plaintiff is entitled to prejudgment interest, injunctive relief, declaratory relief, or any additional equitable relief. The Clerk is directed to schedule a conference of counsel to discuss what further evidence and briefing may be required to resolve the outstanding issues in this case.

## CONCLUSION

With due weight given to the AHO's findings, the preponderance of the evidence demonstrates that the DBVI erred in failing to reimburse the travel expenses Millay incurred in traveling to and from Job Corps from February 2011 through April 2012. The AHO's decision is therefore **REVERSED.** The Court **DEFERS RULING** on the amount of expenses the DBVI must pay and whether Millay is entitled to any further relief.

**SO ORDERED**.

/s/ Nancy Torresen
United States District Judge

Dated this 9th day of December, 2013.